Wrobel & Schatz LLP
1040 Avenue of the Americas, Suite 1101
New York, NY 10018
Tel.:    (212) 421-8100

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
------------------------------------------------------------x

BIENVENIDO FRANCO, Individually and on
Behalf of All Others Similarly Situated,

                                      Plaintiffs,

               -against-

IDEAL MORTGAGE BANKERS, LTD.
D/B/A LEND AMERICA,

                                      Defendants.
------------------------------------------------------------x

WILLIAM FRASER and BRIAN McCABE,
Individually, and on Behalf of All Others
Similarly Situated,
                                      Plaintiffs,
               -against-

IDEAL MORTGAGE BANKERS, LTD. D/B/A
LEND AMERICA, INC., MICHAEL ASHLEY,
TIMOTHY MAYETTE, HELENE DECILLIS,
and MICHAEL PRIMEAU,

                                      Defendants.

------------------------------------------------------------x

07-cv-3956 (JS)(AKT)

RULE 56.1
COUNTERSTATEMENT OF
MICHAEL ASHLEY

         Defendant Michael Ashley, by undersigned counsel, respectfully submits this

Rule 56.1 Counterstatement pursuant to Local Civil Rule 56.1 and Section E of the

Individual Motion Practices of the Honorable Joanna Seybert, setting forth those issues as

to which there exists a genuine issue of material fact.

<u>Preliminary Objections</u>

Prior to responding to the individual paragraphs of plaintiffs' Rule 56.1 Statement, we note the following reasons why the statement is inadequate grant plaintiffs' motion for summary judgment as to liability. Simply put, the motion is not supported by sufficient proofs, is premature because discovery is ongoing,[1] and is wasteful because the it does not resolve the interrelated, and factually dense, issues of damages.

In the space that follows, we set forth individual responses to plaintiff's asserted facts concerning Mr. Ashley, indicating whether (1) the asserted fact is not supported by the cited evidence because the evidence is incompetent, insufficient, or inadmissible; (2) the asserted fact is contradicted by other record evidence; (3) defendant Ashley is not in a position to admit or deny the asserted fact; and/or (4) the asserted fact is accurate. We do not respond to asserted facts that, although technically objectionable, are largely accurate and not material to the issues implicated in the motion for partial summary judgment (numbers 11-13) or to asserted facts that do not concern Mr. Ashley (numbers 42-52 (Ms. DeCillis) and 53-72 and 74 (Mr. Primeau)), although we note that some of these asserted facts are inconsistent with the assertions concerning Mr. Ashley.

> *1.  Before June 1, 2009, Defendants Ideal Mortgage Bankers, Ltd. d/b/a Lend America, Inc. Michael Ashley, Helene DeCillis and Michael Primeau (collectively "Lend America") failed to pay a guaranteed salary of $455 or more to all of the opt-in plaintiffs in this case except for the following 12 opt-ins: John Arkenau, Susan Bonsera, Wankavelika Castillo, Christopher Crispino, Lizette Gonzalez, Joseph LaCalamita, Roy Longhitano, Michael Manning, Joseph Votta, Duane Warner, Adam Whalan, and Stephen Zadwydas. (See Exhibit A, Defendants' Response to Plaintiffs' Second Set of Interrogatories, Interrogatory No. 12;*

---

[1] *See* accompanying Affirmation of Philip R. Schatz dated July 28, 2010.

> Exhibit B, Deposition of Timothy Mayette at 34-35 & 84-86; Exhibit C,
> Deposition of Helene DeCillis at 73 & 76-77).

Response 1:

Disputed. The cited evidence fails to establish this compound proposition,[2] and other record evidence contradicts it. *See, e.g.,* DeCillis Dep. 7:42:24-75:3; 76:11-12; Declaration of Fred Norris date June 13, 2008 ("Norris Dec.", Docket No. 47-8) ¶ 3; Declaration of Brian Fried dated June 13, 2008 ("Fried Dec.", Docket No. 47-5) ¶¶ 3, 6; Declaration of Heidi Frigano dated June 12, 2008 ("Frigano Dec.", Docket No. 47-6) ¶¶ 3, 6; Declaration of Denise Tyler dated June 12, 2008 ("Tyler Dec.", Docket No. 47-7) ¶ 6; Declaration of Helene DeCillis dated July 27, 2010 ("DeCillis Dec.") ¶¶ 18, 19; Declaration of Elizabeth Angebrandt dated July 27, 2010 ("Angebrandt Dec.") ¶ 8 (Lend America started paying minimum wage in June 2008).[3] Because he was not directly

---

[2] Lend America's March 19, 2009 Responses to Franco's Second Set of Interrogatories (Plaintiffs' Rule 56.1 Statement Exhibit A) ¶ 12 states that the 12 identified opt-in plaintiffs were paid a minimum guaranteed salary of $455 per week or more prior to June 27, 2008. Mr. Mayette's deposition testimony (Plaintiffs' Rule 56.1 Statement Exhibit B) is incompetent. Mayette only worked for Lend America from 2002 or 2003 to June 2004, Mayette Depo. 113:7-114:10 and 115:11-14, when the company was a "start-up." *Id.* at 26:8-13. He came back to Lend America from February 2005-June 2005, but during this period he was working for Joseph Forgione, an outside owner of the company, to determine whether Forgione should "bring[] in someone else to run the company." *Id.* at 52:14-53:5. He has no knowledge of the company or its operations after June 2005. *Id.* at 115:15-116:14. Indeed, he denies any knowledge of payroll issues or hours work even when he was actively employed as CFO. *Id.* at 116:15-24. Ms. DeCillis's cited deposition testimony is not supportive. Moreover, other testimony from her deposition contradicts the assertion. She testified, for example, that there were loan officers who were paid on salary between 2003 and 2007. DeCillis Depo. 74:24-75:3; 76:11-12.

[3] The declarations of Mr. Norris, Mr. Fried, Ms. Frigano, and Ms. Taylor are already part of the court record [Franco Docket No. 47]. The declarations of Ms. DeCillis and Ms. Angebrandt are being submitted in opposition to plaintiffs' motion by co-defendant Ms. DeCillis. Excerpts from Mr. Franco's deposition are attached as Exhibit A to the accompanying affirmation of Philip R. Schatz

involved in minimum wage and overtime decisions or implementation, because Lend America's human resources and payroll departments did not report to him, and because the only individuals who controlled Lend America's operations were its owners, Primeau and Forgione, *see* DeCillis Dec. ¶¶ 8, 11, Mr. Ashley has only limited knowledge of the subject matter of this asserted fact.

> *2. Before June 1, 2008, Lend America did not pay its loan officers overtime. (See Exhibit A, Defendants' Response to Plaintiffs' Second Set of Interrogatories, Interrogatory No. 11; Exhibit B, Deposition of Timothy Mayette at 37-39).*

Response 2:

Disputed. The proposition is contrary to Ms. DeCillis's testimony that overtime had to be approved by a manager before May 1, 2008. DeCillis Depo. 86:10-20; *see also* Declaration of Elizabeth Angebrandt dated July 27, 2010 ("Angebrandt Dec.") ¶ 10 (from 2003-2009, overtime permitted only if pre-approved by department manager). Moreover, there is evidence that plaintiffs and other loan officers did not work overtime. Although his testimony is not competent for most of the time period in issue, Mr. Mayette testified that he was not aware of any loan officer that worked more than 40 hours per week, Mayette Depo. 124:13-15, and that most loan officers did not work in the mornings, but only began to trickle-in in the afternoon. *Id.* 118:7-19.

In addition, the cited evidence fails to support the proposition.[4]

---

[4] Interrogatory Answer No. 11 (Plaintiffs' Rule 56.1 Statement Exhibit A) does not state that no overtime was paid before June 1, 2008. It states merely that effective June 1, 2008 Lend America modified its loan officer program "[t]o remain competitive in current, turbulent economic conditions." Mr. Mayette's deposition testimony is incompetent for the reasons set forth in response to paragraph 1. The cited testimony is not supportive in any case, because Mr. Mayette denies knowledge of whether loan officers were paid overtime during his employment. Mayette Depo. at 38:6-39:3.

As with the other asserted facts concerning wage and hour policies, because he was not directly involved in minimum wage and overtime decisions or implementation, because Lend America's human resources and payroll departments did not report to him, and because the only individuals who controlled Lend America's operations were its owners, Primeau and Forgione, *see* DeCillis Dec. ¶¶ 8, 11, Mr. Ashley has only limited knowledge of the subject matter of this asserted fact.

> *3. Before May 1, 2008, Lend America did not pay its loan officers a guaranteed minimum wage. See Exhibit A, Defendants' Response to Plaintiffs' Second Set of Interrogatories, Interrogatory No. 11; Deposition of Timothy Mayette at 32-35 & 84-88; Exhibit C, Deposition of Helene DeCillis at 73 & 76-77).*

Response 3:

Disputed. DeCillis Dec. ¶¶ 18-19; DeCillis Dep. 73-77; Tyler Dec. ¶ 4-7; Fried Dec. ¶¶ 3-5; Frigano Dec. ¶¶ 3-5; Norris Dec. ¶ 3. As with numbers 1-2, because minimum wage and overtime policies were not part of his job duties, Mr. Ashley has only limited knowledge of the subject matter of this asserted fact. Once again, the cited evidence fails to support the proposition.[5]

---

[5] Interrogatory Response No. 11, as indicated above, does not state that no guaranteed minimum wage was paid before June 1, 2008. It states merely that effective June 1, 2008 Lend America modified its loan officer program "[t]o remain competitive in current, turbulent economic conditions." As already indicated, there is evidence that some loan officers – including Mr. Franco – were paid a minimum wage at some point during their employment. Mr. Mayette's deposition, besides being incompetent and self-interested, is also unsupportive because Mr. Mayette indicates that some loan officers may have had base salaries for part of their employment, Mayette Depo. 34:25-35:25, and because he denied knowing whether any loan officers were paid a minimum wage, *Id.* 40:3-5, whether they were entitled to a minimum wage, *Id.* 74:20-24, or whether any loan officer had ever complained about not being paid a minimum wages. *Id.* 108:8-12. Ms. DeCillis's testimony is not conclusive. She states merely that she assumes that loan officers were paid on commission and that, in some point in 2008, they were paid minimum wage. DeCillis Dep. 73:2-16.

> *4. Before June 1, 2008, Lend America failed to keep time records or otherwise accurately record the time worked by its loan officers. (See Exhibit A, Defendants' Response to Plaintiffs' Second Set of Interrogatories, Interrogatory No. 9).*

<u>Response 4</u>:

Disputed in part. Lend America's Interrogatory Response No. 9 states, subject to general and specific objections, that the company did not have methods to record time worked by loan officers prior to June 1, 2008. However, Ms. DeCillis testified that she thought that managers tracked employee time at some point in time, and that, in or around December 2007, prior to the institution of the guaranteed minimum wage, the company instituted a computer based time-clock system. DeCillis Depo. 90:11-92:22; *see also* Angebrandt Dec. ¶ 9. Because all hiring, firing, and employee compensation and benefits issues were handled by Lend America's human resources department, and all accounting and payroll issues handled by Lend America's accounting department, who did not report to Mr. Ashley, DeCillis Dec. ¶¶ 8, 12, Mr. Ashley has only limited knowledge of the subject matter of this asserted fact.

> *5. Before June 1, 2009, Lend America employed the following opt-in plaintiffs as inside sales loan officers:*
>
> *Desiree Vaughan; Hanokya Milllings; Debra Ferrer; Jean Oriol; Kinley Dutton; Kharl H.Abellard; Nicholas Lazos; Dan Smith; Anastasia Toom; Michael McDermott; Peter Ronga; Jermaine Griffin; Charles C. Haynes; Trevor Smith; John Lopes; Gwen Ziccardi; Michael Figat; Michelle Solomos; David Connor; Anthony Glavin; Dennis Jaeger; Phillip Cervone; Andrew Taranto; William Lopez; Antun J. Saric; Neil Margolies; John Albanese; Gary Hosking; James Standford; Rajnikant Parikh; Michael Rappaport; David Rossi; Jason Kubat; Dimos Tirovolas; Celeste Rivera; Joseph M. Racioppi; Mateo Young; Frank Bifulco; Maureen Jette; Michael Ojeda; Marcial Ojeda; Vincent Lombardo; Ronald Harris; Rihard Takacs; Patrick O'Brien; Kevin Duphiney; Matthew*

*Crosta; Paul C. Callender; Hemchand Persaud; Gregory Topal; Steven Ceballos; Keither Stanton; Greg Parmiter; Timothy Parmiter; Matthew T. Parmiter; Pamela Kaneols; Mark Lederman; Robert R. Newman, Jr.; David Richardson; Anthony Ostacoli; Jose F. Moleon; Mark Kane; Vivian Kane; Eileen Harris; Yesenia Niosi; Jeronnie McDougald, Jr.; Scott Yarwood; Naheem Z. Hassan; Matthew Houck; Gabriel Poltielov; Leah Priceman; Brian Puls; Matt Kissin; Jeremy P. Yan; Eric Greenstein; Christopher C. Ryanl Gus Binos; Joseph Grella; Patrick Neferis; Brian Cappiello; George Agovino; Seth Weiner; Michael Reahl; Thomas L. Sarantopoulos; Trish Montefel; Eric W. Huebsch; Charles Pedroso; Edmond Jaku; Sandra Always; Huma Halimi; Aaron Beta; Thomas J. Covello; Matthew Douglas; Robert Hasho; Christopher Rothar; Joseph Romano; Chris Siefert; Yenny Ochoa; Todd Bardfeld; Jeffrey R. Hurst; James Pantazis; Matthew Kubelle; Bobby L. Stewart, Sr.; Neil Topal; Marion J. Santos; Hussam Elshazly; Tom Bosco; Christian Guerrero; Anthony Caggiano; Joseph Czizik; Mohamed Khan; Robert Oritz; Samuel Miller II; Clarence Quist; Alain Brown; Terry Owens; Suzanne Mason; Ravin Lakhram; Scott Ross; Paul Femandes; Robert DePaolo; David Darity; Darryl Burt; Jorge Sousa; Vincent Cami; Bert Brown; Donald Alber; Steven Trebatchi Jason Montero; Michael Lazari; Charles Gianchetta; Paul J. Cellura; Robert Krebs; Gregory Snead; Jeremy Cohn; Dominic Geraci; Alex Berger; Thomas Scansarole; Thomasina Hinds; Michael Veli; John Martin; Aaron N. Daniels; Brad Richardson; Mario Castro; Ralph Glowacki; David Pescetto; Frederique Rogers; Brian Muhlhauser; Fernando Serrano; Dan Shapiro; James Siniscalchi; Adele Somyak; Ana Sotomayor; Artem Uvaydov; Reynold Vaughn; Lalit Chabra; Bruno Mirabella; Michael J. Specht; Paul T. Simonette; Andrew Giuliano; Jennifer Parmiter; James Yorio; Gerard La Franca; Carlos Irzary; Marc Rybacki; Virginia Linder; Arturs Kalejs; Roxanne Malave; Francesca Lever; Emanuel Catechis; Nakia Hinds; Natesha Hinds; James P. Gregory; Sherill Williamson-Allen; James Gutierrez; Susan Koehl; Norbert Katz; Stanley Hubbard; Ralphael Jefferson; Rona Nino; Steven Palacios; Joseph Ferraro; Kelechi Iwuoha; Duane Hraska; Gerard A. Wright, Jr.; Jill Dias; William D. Pena; Toussaint Forbes; Anthony Thompson; Steven Asaln; Raymond McPhillips; Royce Potts; Gregg Freiermuth; Edward Brightman; Christopher J. Smith; Salvatore Viviano; Brian Figat; Christopher R. Vrabel; David Ross Kaphan; Percy Gaston; Jaron Wilcox; Edward F. Palacio, Jr.; Anthony Llanes; Andy Liriano; Patricia Canone; Christian Berio; Matthew Cellura; Eliezer Martinez; Danny Caicedo; Anthony Basile; Darci J. Koehl; Nya Creary; Christopher Cooley; Andrew Guthrie; Thomas J. Ormsby; Brick Cifuentes; Gregory Remy; Gavin graham; Walter Patterson; Corey Waiters; Leslie Solomon; Kyle Barnes; Anthony Macaluso; William Fraser; Courtney Chite; W. Reese O'Hanlon, Jr.; Brian McCabe; Aaron May; Shawn Stuart; Jon-Paul T. LoBianco; Jason Rubinstein; Sean Tang; Robert Carroll; Ralphie Tarazi; Joseph Cianci; Carmela Della Monica; Amy McCabe; Jerry Maneiro; Frank Maniscalco; Michael Cirelli; David Sandino; Naveed Khan; William Helfricht; Michele DePinto; John M. Keil, TI; Christopher Peterson; Evelyn Arvelo; Joseph Guida; Richard Delaney; Michael J. Ragona; Seth McKenna; Loreen J. James;*

*Dustin J. Sabella; James Vosseler; John Hatzikonstantinov; Jonathan Guida; Mohamed Monem; Carlos Bracero; Kyle Nielsen; Gary Branis; Christian Durso; George J. Guarascio; Ralph A. Palmero; Jeff Sosna; Steven Zias; Matthew Marano; Francesco V. Durso; Randall S. Donadio; Jonathan Ciervo; Kenneth Feldman; Jeffrey Blank; Michael Cymbala; Jason Monshine; Eric Alvar; James D. Ford, III; and Louis Romeo (See Exhibit A, Defendants' Response to Plaintiffs' Second Set of Interrogatories, Interrogatory No. 1).*

Response 5:

      This asserted fact, and asserted facts 6-9, are not, strictly speaking, relevant to plaintiffs' motion for partial summary judgment as to liability. The cited interrogatory response does not completely support the asserted fact, because it only provides a non-exclusive list of loan officers subject to the Outside Sales Exemption as of the date of the response, March 19, 2009. It does not consider, let alone identify, inside loan officers. Nor does it consider or address the approximately 38 persons who have joined the action since March 19, 2009, or the approximately 4 persons who have opted out of the action since March 19, 2009.

      *6. Lend America contends that only the following opt-in plaintiffs are subject to the Outside Sales Exemption: Hakim Abdurraheem, Kyle Barnes, Denise Brown, Ardel Davis, Jeremy Davis, Ivan Decarvalho, Renol K. Fleurentin, Titus Foster, Bienvenido Franco, Jakob Gearwar, Jay Golden, Rebecca Goodwin, James Gregory, Lawand Hoover, Robert Jones, Edward Kaleck, Erik Knors, Jeffrey Langer, Jude le Conte, Roy Lonhitano, Caroline McCarthy, Jessica Mullgrav, William Satterthwaite, Dawn Sears, Daniel Smith, Donald Stallworth, James Stanford, and George Todd. (See Exhibit A, Defendants' Response to Plaintiffs' Second Set of Interrogatories, Interrogatory No. I).*

Response 6:

      As with number 5, the cited interrogatory response does not completely support the proposition, because it only provides a non-exclusive list of opt-in plaintiffs subject to the Outside Sales Exemption as of March 19, 2009. It does not consider or address the

approximately 38 persons who have joined the action since March 19, 2009, or the

approximately 4 persons who have opted out of the action since March 19, 2009.

> *7. For the period before June 1, 2008, Lend America contends that only the following opt-in plaintiffs are subject to the Administrative Exemption: John Arkenau, Susan Bonsera, Wankavelika Castillo, Christopher Crispino, Lizette Gonzalez, Joseph LaCalamita, Roy Longhitano, Michael Manning, Joseph Votta, Duane Warner, Adam Whalan, and Stephen Zadwydas. (See Exhibit A, Defendants' Response to Plaintiffs' Second Set of Interrogatories, Interrogatory No. 3).*

Response 7:

As with number 5, the cited interrogatory response does not completely support

the proposition, because it only provides a non-exclusive list of opt-in plaintiffs subject to

the Outside Sales Exemption as of March 19, 2009. It does not consider or address the

approximately 38 persons who have joined the action since March 19, 2009, or the

approximately 4 persons who have opted out of the action since March 19, 2009.

> *8. For the period before June 1, 2008, Lend America contends that only the following opt-in plaintiffs are subject to the Highly Compensated Exemption: Susana Bonsera, Lizette Gonzalez, and Stephen Zadwydas. (See Exhibit A, Defendants' Response to Plaintiffs' Second Set of Interrogatories, Interrogatory No, 5).*

Response 8:

As with number 5, the cited interrogatory response does not completely support

the proposition, because it only provides a non-exclusive list of opt-in plaintiffs subject to

the Highly Compensated Exemption as of March 19, 2009. It does not consider or

address the approximately 38 persons who have joined the action since March 19, 2009,

or the approximately 4 persons who have opted out of the action since March 19, 2009.

> *9. For the period before June 1, 2008, Lend America contends that only the following opt-in plaintiffs are subject to the Combination Exemption: John Arkenau, Susan Bonsera, Wankavelika Castillo, Christopher Crispino, Lizette*

*Gonzalez, Joseph LaCalamita, Roy Longhitano, Michael Manning, Joseph Votta, Duane Warner, Adam Whalan, and Stephen Zadwydas. (See Exhibit A, Defendants' Response to Plaintiffs' Second Set of Interrogatories, Interrogatory No. 7).*

Response 9:

As with number 5, the cited evidence does not completely support the proposition, because it only provides a non-exclusive list of opt-in plaintiffs subject to the Combination Exemption as of March 19, 2009. It does not consider or address the approximately 38 persons who have joined the action since March 19, 2009, or the approximately 4 persons who have opted out of the action since March 19, 2009.

*10. On June 27, 2008, Lend America changed its loan officer compensation program providing a guaranteed minimum salary equal to the applicable minimum wage for each hour worked in each workweek, plus overtime premiums at the applicable regular rate for each hour of overtime worked. (See Exhibit A, Defendants' Response to Plaintiffs' Second Set of Interrogatories, Interrogatory No.11 Exhibit C, Deposition of Helene DeCillis at 73 & 76-77).*

Response 10:

True. In June 2008, after this lawsuit was filed, on advice of counsel, Lend America changed its loan officer compensation to require payment of minimum wages and overtime. DeCillis Dec. ¶ 19; Angebrandt Dec. ¶8. Mr. Ashley was part of this group decision.  DeCillis Depo. 77:17-78:14; DeCillis Dec. ¶ 19.This change in policy is not relevant to determining whether defendants can claim exemptions to FLSA or whether defendants policies prior to the change were in good faith. *E.g.,* Fed. R. Evid. 407; *Liger v. New Orleans Hornets NBA Ltd. Partnership*, No. 05-1969, 2008 WL 348800 (E. D. La. Feb. 6, 2008).

Notably, all loan officer compensation at Lend America, whether for inside or outside loan officers, was reviewed and approved by outside legal counsel and outside auditors, and was found to be consistent with prevailing practices in the mortgage industry. DeCillis Dec. ¶¶ 18, 22. Lend America compensated loan officers through a variety of ways: Some were paid salaries or draws; some were paid pure commissions; and some were paid minimum wages. DeCillis Dec. ¶ 18; Tyler Dec. ¶¶ 4, 6, 7. At all times pertinent to this action, the prevailing practice in the mortgage industry was to compensate mortgage loan officers by commissions only. DeCillis Dec. ¶ 23. At no time did any of Lend America's outside professionals warn Lend America's management that its compensation policies violated any applicable law. DeCillis Dec. ¶ 22.

> *14. Michael Ashley functioned as the Chief Executive Officer of Lend America. (Exhibit B, Deposition of Timothy Mayette at 16-17).*

<u>Response 14:</u>

Disputed. The only persons who could individually control the operations of Lend America were its owners, defendant Michael Primeau and Joseph Forgione. DeCillis Dec. ¶ 11. Mr. Primeau was a founder, Chief Executive Officer, President, and sole Director of Lend America. DeCillis Dec. ¶ 11. Mr. Primeau signed all company paychecks, DeCillis Dec. ¶ 28; Angebrandt Dec. ¶ 6, and was in charge of the sales force. Franco Dep. 190:3-19. Forgione was the other founder, and was the sole capital investor of Lend America. DeCillis Dec. ¶ 11; *see also* Franco Dep. 94:3-9 (Mr. Forgione was a "big honcho" and owner). Defendant Michael Ashley was not an owner or director of Lend America. DeCillis Dec. ¶ 8. Consistent with his title of Chief Business Strategist, his duties were to motivate the sales force and generate ideas for marketing and growth of the company.

DeCillis Dec.  ¶ 9. He was not involved in the day-to-day minutiae of running the Sales Department. DeCillis Dec. ¶ 8. He did not sign paychecks, he did not decide overtime or minimum wage policies, and the human resources and payroll departments did not regularly report to him. DeCillis Dec. ¶ 8. Indeed, he was away from Lend America for multiple weeks at a time, throughout the year, pursuing and promoting his racing car business (sponsored in part by Lend America) as part of Lend America's advertising program. DeCillis Dec. ¶ 8; *see also* Franco Dep. 82:14-83:2 (Mr. Ashley was gone from the premises for extended periods doing auto racing).  And, he was at all times subject to the authority of Lend America's owners, Mr. Primeau and Mr. Forgione, who fired him for several months in 2005. DeCillis Dec. ¶ 8.

The deposition testimony of Mr. Mayette is both incompetent and self-interested; throughout his deposition he testified inconsistently with Ms. DeCillis and sought to cast blame on others, including Mr. Ashley, while exonerating himself and Joseph Forgione, an owner of Lend America curiously not named as a defendant by plaintiffs, with whom he admits his interests are aligned and for whom he has worked since June 2004. Mayette Depo. 25:3-7. Indeed, the testimonial evidence at trial will show that Mr. Forgione threw Mr. Ashley out of Lend America for a period in Spring 2005, and had a more substantial ownership and operational interest in Lend America than Mr. Mayette would admit.

*15. Michael Ashley was the highest paid employee of Lend America. (Exhibit B, Deposition of Timothy Mayette at 71-72)*

Response 15:

Disputed. Upon information and belief the owners of Lend America, Mr. Primeau and Mr. Forgione, took more from the company each year of operation than they paid Mr.

Ashley. Defendant has noticed the deposition of Mr. Forgione. The deposition testimony

of Mr. Mayette is both incompetent and self-interested; throughout his deposition he

testified inconsistently with Ms. DeCillis and sought to cast blame on others while

exonerating himself and his current boss, Mr. Forgione. Mr. Mayette's testimony is also

inconsistent, as he elsewhere says that Mr. Primeau "was getting the most out of anybody

at Lend America." Mayette Depo. 72:4-6.

> *16. Michael Ashley gave direction to the President and Chief Operating Officer of Lend America. (Exhibit B, Deposition of Timothy Mayette at 17-18 & 41).*

Response 16:

Disputed. DeCillis Dec. ¶¶ 8-11. The deposition testimony of Mr. Mayette is

incompetent, biased and untrustworthy, because he is seeking to cast blame on others and

exonerate himself and his boss, Mr. Forgione.

> *17. No one at Lend America gave direction to Michael Ashley. (Exhibit B, Deposition of Timothy Mayette at 17-18).*

Response 17:

Disputed. DeCillis Dec. ¶¶ 8-11; DeCillis Depo. 26:14-24 (Premieau oversaw

entire operation); 29:6-30:10 (Ashley reported to Primeau); 36:4-15 (everybody

effectively reported to Primeau). The deposition testimony of Mr. Mayette is

incompetent, biased, and untrustworthy.

> 18. Michael Ashley was considered the "boss" at Lend America. (Exhibit B, Deposition of Timothy Mayette at 18).

Response 18:

Disputed. DeCillis Dec. ¶¶ 8-11; DeCillis Depo. 26:14-24 (Premieau oversaw

entire operation); 29:6-30:10 (Ashley reported to Primeau); 36:4-15 (everybody

effectively reported to Primeau). The deposition testimony of Mr. Mayette is

incompetent, biased, and untrustworthy.

> *19. Michael Ashley controlled the sales force at Lend America. (Exhibit B, Deposition of Timothy Mayette at 17-18,65,98 & 127; Exhibit C, Deposition of Helene DeCillis at 40- 42).*

Response 19:

Disputed. DeCillis Dec. ¶ 8 (Ashley was not involved in the day to day running of

the sales department and did not decide overtime or minimum wage policies; in addition,

he was away from the company for extended periods); Franco Dep. at 190:3-19 (Primeau

was in charge of the sales force).

> *20. Michael Ashley conducted meetings with Lend America's loan officers. (Exhibit C, Deposition of Helene DeCillis at 128).*

Response 20:

True, but the statement is vague to the point of meaninglessness. Mr. Ashley's job

entailed motivating the sales force and generating new marketing strategies. DeCillis

Dec. ¶ 8. Lead plaintiff Mr. Franco testified that his only interaction with Mr. Ashley was

in "impromptu meetings" (Franco Dep. 52:5-10) where Mr. Ashley gave advice on

salesmanship (*Id.* at 44:3-18) and admonished the sales force to work hard (*Id.* at 278:15-

280:3). Mr. Franco says he never spoke to Mr. Ashley outside these impromptu meetings

(*Id.*).

> *21. Michael Ashley purchased telemarketing leads for Lend America. (Exhibit B, Deposition of Timothy Mayette at 55-56).*

Response 21:

Disputed. The deposition testimony of Mr. Mayette, besides being incompetent, does not support the proposition. Moreover, the proposition is contrary to other testimony by Mr. Mayette and testimony by Ms. DeCillis, both of whom identified Brian Fried as the person responsible for purchasing telemarketing leads. *See* Mayette Depo. 55:8-56:9; DeCillis Depo. 154:4-8.

> *22. Michael Ashley hired and fired Lend America's employees, including loan officers. (Exhibit B, Deposition of Timothy Mayette at 19-21, 39-41,62 & 127-28, Exhibit C, Deposition of Helene DeCillis at 27-28, 46-47 & 109-110).*

<u>Response No. 22</u>:

Disputed. Mr. Ashley did not directly supervise loan officers. DeCillis Dec. ¶ 8. Lend America's human resources department handled all hiring, firing, and employee benefits issues. DeCillis Dec. ¶ 12. The human resources department did not report regularly or directly to Mr. Ashley. DeCillis Dec. ¶¶ 8, 13. The deposition testimony of Mr. Mayette, besides being incompetent, does not support the proposition except as to the hiring of Mr. Mayette himself – which predated the acquisition of Lend America. The most that he or Ms. DeCillis are able to say is that Mr. Ashley may have had the power to hire or fire loan officers, not that he actually did so. Mayette Depo. 127:3-4; DeCillis Depo. 109:20-110:16. *See also* Response to No. 19. In addition, lead plaintiff Mr. Franco testified that he did not know if Mr. Ashley had the power to hire or fire. Franco Dep. 278:15-280:3.

> *23. All of Lend America's loan officers ultimately answered to Michael Ashley. (Exhibit B, Deposition of Timothy Mayette at 93 & 98-99).*

<u>Response 23</u>:

-15-

Disputed. *See* response to numbers 14-19 and 22. Mr. Mayette's testimony is both incompetent and self-interested.

> *24. Michael Ashley had the authority to discipline Lend America's loan officers. (Exhibit C, Deposition of Helene DeCillis at 126).*

Response 24:

Disputed. The cited evidence does not support the proposition.  No part of Ms. DiCillis's cited testimony refers to anyone's ability to discipline loan officers. *See also* DeCillis Dec. ¶ 14 (all decisions regarding hiring, firing, promoting, or disciplining were handled by the managers of the sales department and their immediate supervisors. Although Ashley was a supervisor for business development and motivational issues, DeCillis Dec. ¶ 8, he was not for day to day scheduling or pay issues. *Id.*).

> *25. Michael Ashley had the authority to schedule Lend America's loan officers. (Exhibit C, Deposition of Helene DeCillis at 112).*

Response 25:

Disputed in part. Mr. Ashley may have had authority to schedule meetings or training sessions within the scope of his job title and function, but he did not schedule Loan Officers. As Ms. DeCillis testified, team leaders were responsible for scheduling loan officers and Mr. Ashley did not play any role in that process. DeCillis Depo. 111:18-112:9; *see also* DeCillis Dec. ¶¶ 10, 11, 13). In addition, lead plaintiff Mr. Franco testified that his schedule was set by Mr. Fried (Franco Dep. 58:7-24), that if he wanted to change his schedule he would speak to Mr. Fried, Suzannah Bonsara, Lizette Gonzales, or Heidi Frigano (Franco Dep. 68:9-13, 79:6-16), and that Mr. Primeau was in charge of the sales force (Franco Dep. 190:3-19).

*26. Michael Ashley determined the raises and bonuses to be given Lend America's employees, including loan officers. (Exhibit B, Deposition of Timothy Mayette at 21; Exhibit C, Deposition of Helene DeCillis at 110-11).*

Response 26:

Disputed. Lend America's owners, defendant Michael Primeau and Joseph Forgione, had the ultimate say on all business decisions. DeCillis Dec. ¶ 11. Further, Ms. DiCillis's testimony asserts only that she "believes" that Mr. Ashley had the authority to determine *raises* (she does not mention bonuses), but does not support the proposition that he did so.  DeCillis Depo. 111:14-17.

*27. Michael Ashley had the authority to give promotions to Lend America's loan officers. (Exhibit C, Deposition of Helene DeCillis at 123).*

Response 27:

Disputed. Lend America's owners, defendant Michael Primeau and Joseph Forgione, had the ultimate say on all business decisions. DeCillis Dec. ¶ 11. It is not disputed that Mr. Ashley had the authority to recommend promotions and that his recommendations were routinely granted. However, the ultimate authority for all decisions rested with the equity owners, Michael Primeau and Joseph Forgione.

*28. Michael Ashley supervised employees, including the sales force consisting of loan officers. (Exhibit B, Deposition of Timothy Mayette at 33 & 41-42, Exhibit C, Deposition of Helene DeCillis at 40-43).*

Response 28:

Disputed. DeCillis Dec. ¶ 8 (Ashley was "big picture" idea man and was not involved in the day to day running of the sales department and did not decide overtime or minimum wage policies; in addition, he was away from the company for extended periods). Mr. Mayette's testimony is both incompetent and self-interested, as well as

unsupportive: page 33 of his deposition says merely that sales "reported" to Mr. Ashley,

which does not indicate any supervisory role, and pages 41-42 merely says that Mr.

Ashley had "an open door" for loan officers. Ms. DeCillis's testimony says that Ms.

Frigano and Brian Fried, vice presidents of sales and marketing, "reported" to Mr.

Ashley, but does not say what was involved in that reporting, and she elsewhere testifies

that Ms. Frigano and others oversaw the day-to-day operations of loan officers. *E.g.,*

DeCillis Depo. 42:22-43:7. In addition, lead plaintiff Mr. Franco testified that his

schedule was set by Mr. Fried (Franco Dep. 58:7-24), that if he wanted to change his

schedule he would speak to Mr. Fried, Suzannah Bonsara, Lizette Gonzales, or Heidi

Frigano (Franco Dep. 68:9-13, 79:6-16), and that Mr. Primeau was in charge of the sales

force (Franco Dep. 190:3-19).

> 29. Michael Ashley signed on checks drawn from Lend America's bank accounts,
> including payroll accounts. (Exhibit B, Deposition of Timothy Mayette at 31;
> Exhibit C, Deposition of Helene DeCillis at 115).

Response 29:

Disputed. DeCillis Dec. ¶ 22, 28; Angebrandt Dec. ¶ 6. This statement is one of a

number of statements by which plaintiff attempts to obtain the inference that something

always happened by contending that it might have happened once or occasionally. Mr.

Mayette's deposition testimony is incompetent, self interested, and unsupportive. He

testified that signatures were automated and "guessed" that the signatures were "Primeau,

DeCillis, possibly Ashley, but I'm not positive." Mayette Depo. 31:18-32:2. (For the

Chief Financial Officer to claim that he doesn't even know who signed the company's

checks shows the level of Mr. Mayette's dissembling during his deposition). Ms.

DeCillis's testimony is unsupportive; she testified that Mr. Primeau signed payroll

checks, although she and Mr. Ashley might also have authority to sign bank checks.

DeCillis Depo.115:16-116:12.

> *30. Michael Ashley entered into contracts, including loan agreements, on behalf of Lend America. (Exhibit C, Deposition of Helene DeCillis at 117-19).*

Response 30:

Disputed. The only persons who could individually control the operations of Lend America were its owners, defendant Michael Primeau and Joseph Forgione. DeCillis Dec. ¶ 11. The cited deposition testimony does not support the proposition; Ms. DeCillis testifies that Mr. Primeau signed off on loan agreements for borrowing money, but that Mr. Ashley and Mr. Bhatia "might have" had authority to procure a loan. Mr. Ashley did sign a loan document dated March 26, 2009, but not on behalf of Lend America.

> *31. Michael Ashley made personal guarantees on loans taken by Lend America. (Exhibit C, Deposition of Helene DeCillis at 118-119).*

Response 31:

Disputed. The testimony of Ms. DeCillis is directly contradictory to the suggestion that there were "loans" rather than the single loan document dated March 26, 2009.

> *32. Michael Ashley determined the capital expenditures made on behalf of Lend America, including expenditures for his racing team, luxury automobiles and private jets. (Exhibit B, Deposition of Timothy Mayette at 53-58).*

Response 32:

Disputed. The only persons who could individually control the operations of Lend America were its owners, defendant Michael Primeau and Joseph Forgione. DeCillis Dec. ¶ 11. Mr. Mayette's testimony is both incompetent and self-interested.

*33. Michael Ashley determined the pay plan for Lend America's employees, including loan officers. (Exhibit B, Deposition of Timothy Mayette at 30-31,38-39,62 & 126; Exhibit C, Deposition of Helene DeCillis at 46-48 & 76-79).*

Response 33:

Disputed. *See* response to numbers 14-19 and 22. Mr. Mayette's testimony is both incompetent and self-interested. Ms. DeCillis's testimony is unsupportive: On pages 46-48 she says she "would not know" if Mr. Ashley determined compensation; in pages 77-78 she testifies that the 2008 decision to pay all employees minimum wage was "made in concert with counsel" by "Mr. Primeau, Mr. Ashley, Ms. Tyler, Ms. Frigano, Mr. Becker, and myself." DeCillis Depo. 77:17-78:14.

*34. Michael Ashley changed the compensation plan for Lend America's employees, including loan officers. (Exhibit C, Deposition of Helene DeCillis at 76-79).*

Response 34:

Disputed.  *See* response to number 10.

*35. Michael Ashley determined the hours to be worked by Lend America's loan officers. (Exhibit C, Deposition of Helene DeCillis at 69-70).*

Response 35:

Disputed. Consistent with his title of Chief Business Strategist, Mr. Ashley's duties were limited to the "big picture" generation of marketing ideas and to motivating the sales force. DeCillis Dec.  ¶ 9. He was not involved in the day-to-day minutiae of running the Sales Department. DeCillis Dec. ¶ 8. He did not sign paychecks, he did not decide overtime or minimum wage policies, and the human resources and payroll departments, who were responsible for scheduling, did not regularly report to him. DeCillis Dec. ¶ 8. He was also away from the office for extended periods. *Id.* The cited

testimony is not supportive: Ms. DeCillis repeatedly testified that she was not able to answer the question of who had the authority to dictate hours worked. DeCillis Depo. 69:6-70:17. And, she identified Ms. Frigano and others as overseeing the day-to-day operations of loan officers. *E.g.,* DeCillis Depo. 42:22-43:7. In addition, lead plaintiff Mr. Franco testified that his schedule was set by Mr. Fried (Franco Dep. 58:7-24), that, if he wanted to change his schedule, he would speak to Mr. Fried, Suzannah Bonsara, Lizette Gonzales, or Heidi Frigano (Franco Dep. 68:9-13, 79:6-16), and that Mr. Primeau was in charge of the sales force (Franco Dep. 190:3-19).

> *36. Michael Ashley established the job duties of Lend America's loan officers. (Exhibit C, Deposition of Helene DeCillis at 71).*

Response 36:

Disputed. Consistent with his title of Chief Business Strategist, Mr. Ashley's duties were limited to the "big picture" generation of marketing ideas and to motivating the sales force. DeCillis Dec. ¶ 9. He was not involved in the day-to-day minutiae of running the Sales Department. DeCillis Dec. ¶ 8. He did not sign paychecks, he did not decide overtime or minimum wage policies, and the human resources and payroll departments, who were responsible for scheduling, did not regularly report to him. DeCillis Dec. ¶ 8. He was also away from the office for extended periods. *Id.* The cited testimony is not supportive: Ms. DeCillis testifies that she "believed" that Mr. Primeau, Mr. Ashley, Mr. Fried, Ms. Frigano, and Mr. Breecker were involved in determining the job duties of Lend America's loan officers, but she also denied any involvement herself and qualified her answer as "subjective" and speculative. DeCillis Depo. 69:22-71:16.

> *37. Michael Ashley trained Lend America's loan officers. (Exhibit B, Deposition of Timothy Mayette at 63).*

Response 37:

Disputed. As Ms. DeCillis testified, Mr. Ashley was not responsible for training.'
Christine Angelord and Scott Wein, among others, trained the loan officers. DeCillis
Depo. 112:14-17; 113:9-15. Mr. Mayette's testimony is incompetent and self-interested.

*38. Michael Ashley was responsible for complying with wage and hour policy for
Lend America. (Exhibit B, Deposition of Timothy Mayette at 73-75 & 126).*

Response 38:

Disputed. Mr. Ashley was not involved in the day-to-day minutiae of running the
Sales Department. DeCillis Dec. ¶ 8. He did not sign paychecks, he did not decide
overtime or minimum wage policies, and the human resources and payroll departments
did not regularly report to him. DeCillis Dec. ¶ 8. The human resources department,
which did not report directly or regularly to Mr. Ashley, was responsible for all employee
compensation and benefits issues. DeCillis Dec. ¶ 12. Mr. Mayette's testimony is
incompetent and self-interested. The statement doesn't make any sense, anyway –
presumably, every employee is "responsible for complying" with Lend America's
policies.

*39. Michael Ashley had the authority to enforce wage and hour policy for Lend
America's employees, including loan officers. (Exhibit B, Deposition of Timothy
Mayette at 40 & 126).*

Response 39:

Disputed. *See* response to number 38.

*40. The Human Resources and Payroll departments at Lend America reported
directly to Michael Ashley. (Exhibit B, Deposition of Timothy Mayette at 75 &
126).*

Response 40:

Disputed. DeCillis Dec. ¶ 8 (human resources and payroll departments did not report regularly to Mr. Ashley); ¶ 13 (human resources and accounting departments reported directly to the CFO and ultimately to the owners). Mr. Mayette's testimony is incompetent and self-interested.

     *41. Michael Ashley established marketing policies for Lend America. (Exhibit C, Deposition of Helene DeCillis at 148-150).*

Response 41:

Disputed. Lend America's owners, defendant Michael Primeau and Joseph Forgione, had the ultimate say on all business decisions, including marketing policies. DeCillis Dec. ¶ 11. Within the parameters of his title and job function, Executive Vice President and Chief Business Strategist of Lend America, Mr. Ashley had a voice concerning marketing policies for Lend America, but he was always answerable to the owners of Lend America and to the other executives at Lend America. The cited testimony is not dispositive: Ms. DeCillis testified merely that Mr. Ashley was more "like the visionary, as opposed to the person who carried out the details kind of thing." DeCillis Dep. 148:17-149:7.

     *73. Michael Ashley asserted the Fifth Amendment in response to each question asked to him about this case. (Exhibit D, Deposition of Michael Ashley).*

Response 73:

True. Mr. Ashley asserted the Fifth Amendment privilege against self incrimination, upon advice of counsel, due to pending investigations concerning Lend America. The assertion the privilege, however, does not by itself establish any evidentiary fact, and may not be used to avoid the burden of proving each and every element of the causes of action for each of the plaintiffs in this collective action.

Although the assertion of the privilege in a civil suit may permit an adverse inference, *Baxter v. Palmigiano*, 425 U.S. 308, 335 (1976), but an adverse inference "is not *required* ...., even at trial" and "what inferences the factfinder may ultimately draw is a question of fact for trial." *U.S. S.E.C. Commission v. Universal Exp., Inc.,* 475 F. Supp. 412, 439 n. 20 (S.D.N.Y. 2007) (Lynch, J.) (emphasis in original).

Dated: New York, New York
　　　　July 28, 2010

　　　　　　　　　　　　　　　WROBEL & SCHATZ LLP


　　　　　　　　　　　　　　　By: _____/s_____
　　　　　　　　　　　　　　　　　Philip R. Schatz (PS 6158)
　　　　　　　　　　　　　　　1040 Avenue of the Americas, Suite 1101
　　　　　　　　　　　　　　　New York, NY 10018-3703
　　　　　　　　　　　　　　　Tel.: (212) 421-8100 x 313
　　　　　　　　　　　　　　　*Attorneys for Michael Ashley*

Cc:　　Via ECF
　　　　Erik H. Langeland, Esq.
　　　　Erik H. Langeland, PC
　　　　500 Fifth Avenue, Suite 1610
　　　　New York, NY 10110
　　　　Tel.:　(212) 354-6270
　　　　*Attorneys for Plaintiffs*

　　　　Joseph A. Vogel, Esq.
　　　　Kravet & Vogel, LLP
　　　　1040 Avenue of the Americas, 11th Fl.
　　　　New York, NY 10018
　　　　Tel.:　(212) 997-7634
　　　　*Attorneys for Helene DeCillis*

　　　　Jeffrey H. Weinberger, Esq.
　　　　Law Offices of Jeffrey H. Weinberger
　　　　475 Park Avenue South, 33rd Floor
　　　　New York, NY 10016
　　　　Tel.:　(212) 686-0900
　　　　*Attorneys for Timothy Mayette*

*By US Mail*:
Michael Primeau (*Pro Se*)
P.O. Box 740
Lynbrook, NY 11563

Ideal Mortgage Bankers, Ltd. (*Pro Se*)
c/o Helene DeCillis (Chief Operating Officer)
6 Norris Lane
East Setauket, NY 11733