UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
----------------------------------------X
BIENVENIDO FRANCO, WILLIAM FRASER,
BRIAN McCABE, on behalf of themselves
and all others similarly situated,

                     Plaintiffs,        <u>MEMORANDUM & ORDER</u>
                                         07-CV-3956 (JS)(AKT)

      -against-

IDEAL MORTGAGE BANKERS,LTD., d/b/a
LEND AMERICA, ET AL.,

                     Defendants.
----------------------------------------X
APPEARANCES:
For Plaintiff:        Erik Harald Langeland, Esq.
                       Erik H. Langeland, P.C.
                       500 Fifth Avenue, Ste. 1610
                       New York, NY 10110

                       James B. Zouras, Esq.
                       Ryan F. Stephan, Esq.
                       Stephan Zouras LLP
                       205 N Michigan Ave., Ste. 2560
                       Chicago, IL 60601

For Defendants:
Ideal Mortgage       No appearances.

Timothy Mayette     Jeffrey H. Weinberger, Esq.
                       475 Park Avenue South, 33rd Floor
                       New York, NY 10016

Helene DeCillis     Joseph A. Vogel, Esq.
                       Kravet & Vogel, LLP
                       1040 Avenue of the Americas, Ste. 1101
                       New York, NY 10118

Michael Primeau    Michele Kahn, Esq.
                       Kahn & Goldberg LLP
                       708 Third Avenue, 19th Fl
                       New York, NY 10017

Michael Ashley

Philip R. Schatz, Esq.
Wrobel & Schatz, LLP
1040 Avenue of the Americas, 11th Floor
New York, NY 10018-3703

SEYBERT, District Judge:

On September 21, 2007, Plaintiff Bienvenido Franco on behalf of others similarly situated ("Plaintiffs"), sued Ideal Mortgage Bankers, Ltd., d/b/a Lend America ("Lend America"), alleging that Ideal violated the Fair Labor Standards Act ("FLSA"), 29 U.S.C. § 201, et. seq., by failing to pay its loan officers minimum wages and overtime. Plaintiffs later amended their Complaint to also name four Individual Defendants: Michael Ashley, Timothy Mayette, Helene DeCillis, and Michael Primeau. The Court has conditionally certified this case as an FLSA collective action.

Plaintiffs have now moved for partial summary judgment. Specifically, Plaintiffs seek summary judgment declaring that: (1) the FLSA's exemptions do not apply to most class members; (2) Defendants Ashley, DeCillis, and Primeau are individually liable as FLSA "employers"; (3) Plaintiffs are entitled to liquidated damages; and (4) Defendants' conduct was willful, thereby expanding the statute of limitations to three years. In addition, Plaintiffs seek an interim award of attorneys' fees.

For the following reasons, Plaintiffs' motion is GRANTED IN PART AND DENIED IN PART.

<u>BACKGROUND</u>

I. <u>Summary</u>

This is an FLSA minimum wage and overtime case. Before going out of business, Lend America was a mortgage banker, and employed the Plaintiffs as "loan officers."[1] Most Plaintiffs were "inside sales" officers, meaning that they performed their job at one of Lend America's offices. (Pl. 56.1 Stmt. ¶ 5.)[2] Plaintiffs contend that Lend America violated the FLSA by not paying these inside sales officers minimum wages and overtime. In this regard, Plaintiffs contend that no other FLSA exemption covers the inside sales officers. Finally, Plaintiffs contend that the Individual Defendants each had sufficient control over Lend America, and its employment practices, to render them individually liable under the FLSA.

As discussed below, however, it is difficult to provide a more comprehensive statement of the facts. For, after

---

[1] According to the Second Amended Complaint, loan officers' primary duty was to sell residential mortgage loans. (SAC ¶¶ 13-16.) But the parties' Rule 56.1 Statements do not include this fact, or otherwise describe loan officers' job duties.

[2] For a small number of Plaintiffs, it is disputed whether they were inside or outside sales officers. (Pl. 56.1 Stmt. ¶ 6.) The present summary judgment motion does not seek summary judgment as to these Plaintiffs' claims.

reviewing the parties' Rule 56.1 Statements, it appears that few facts are truly and/or fully undisputed.

## II.  Plaintiffs' Rule 56.1 Statement

Plaintiffs' Rule 56.1 Statement contains 74 paragraphs of purportedly undisputed facts. But, in significant part, Plaintiffs' citations to the record do not support the listed factual claims. And, even when Plaintiffs' citations do support their factual contentions, Defendants' Rule 56.1 Statements frequently demonstrate that significant factual disputes exist. Consequently, the Court does not credit much of Plaintiffs' Rule 56.1 Statement.

On the whole, Plaintiffs' Rule 56.1 Statement suffers from several global flaws.[3] **First**, Plaintiffs rely heavily on Defendant Timothy Mayette's deposition testimony. But Mr. Mayette worked for Lend America only from September 2003 to June 2004, and again from February 2005 to June 2005. (Mayette Tr. 14, 21, 25.) So, for most of the class period, Mr. Mayette's testimony has only limited probative value, at best.[4] Among

---

[3]  The Court's listed examples for each flaw are just that, examples. The Court has not endeavored to catalogue every incident that qualifies under the five listed global flaws.

[4]  In Herman v. RSR Sec. Services Ltd., 172 F.3d 132, 140 (2d Cir. 1999), the Second Circuit held that an individual defendant's signing of paychecks outside the statutory period served as evidence that the defendant "had the authority" to sign paychecks. Interpreting Herman, one Southern District case has opined that "past exercises of authority indicate the continued

4

other things, except for the brief periods of his employment, Mr. Mayette cannot competently testify about whether Lend America paid minimum wages or overtime before May/June 2008. (Pl. 56.1 Stmt. ¶¶ 2, 3.)

**Second**, Plaintiffs significantly misstate both deposition testimony and Lend America's interrogatory responses. For instance, Plaintiffs claim that Lend America's Interrogatory Response ¶ 11 evidences Lend America's failure to pay minimum wages or overtime before May/June 2008. (Pl. 56.1 Stmt. ¶¶ 2, 3.) But Lend America's Interrogatory Response ¶ 11 states only that, after June 1, 2008, it modified its compensation plan to "guarantee[]" minimum wages plus overtime. This Interrogatory Response <u>does</u> <u>not</u> say that, before that date, <u>no</u> loan officers received minimum wages or overtime. And, in fact, the record supports that Lend America paid its loan officers in a variety of ways before June 1, 2008, with some receiving minimum wages and overtime. (DeCillis Tr. 75-76, 86; Tyler Decl. ¶ 7; Fried Decl. ¶ 3; Norris Decl. ¶ 3; Mayette Tr. 35.)

Likewise, Plaintiffs consistently misrepresent a witness' belief, speculation, or lack of memory as an uncontested fact. For instance, Plaintiffs cite Mr. Mayette's testimony to support that Lend America "did not pay its loan

exercise of authority." <u>Spicer v. Pier Sixty LLC</u>, 08-CV-10240, 2010 U.S. Dist. LEXIS 76782, at *34-35 (S.D.N.Y. July 26, 2010).

officers overtime." (Pl. 56.1 Stmt. ¶ 2.) But Mr. Mayette actually said that he didn't remember whether Lend America paid overtime. (Mayette Tr. 39.) Similarly, Plaintiffs cite Ms. DeCillis' deposition at pp. 109-110 to support their claim that Mr. Ashley hired and fired employees, including loan officers. (Pl. 56.1 Stmt. ¶ 22.) But, in the cited testimony, Ms. DeCillis actually stated that Mr. Ashley "probably" could fire a loan officer, merely "guess[ed]" that he could hire one, and agreed with counsel's statement that she "believe[d]" Mr. Ashley could give someone a raise.

In yet another example, Plaintiffs claim that Mr. Ashley "signed checks drawn from Lend America's bank accounts, including payroll accounts." But the cited testimony does not support that claim. Mr. Mayette only speculated that Mr. Ashley "possibly" signed checks. (Mayette Tr. 31.) And Ms. DeCillis represented only that Mr. Ashley had the authority to sign checks, not that he actually did so. (DeCillis Tr. 115.) In fact, Ms. DeCillis testified that Mr. Primeau, and <u>not</u> Mr. Ashley, signed the payroll checks. (<u>Id.</u>)

**Third,** even when not actually misstated, Plaintiffs frequently over-represent what the evidence supports. This is most telling in Plaintiffs' claims concerning the numbers of opt-in Plaintiffs who fit certain categories, such as those not paid minimum wages or who might be subject to the outside sales

exemption.  (Pl. 56.1 Stmt. ¶¶ 1, 6.)[5]  Plaintiffs support these statements by referencing Lend America's Second Interrogatory Responses.  But Lend America served this document on March 19, 2009.  Thus, Lend America's responses do not include Plaintiffs who opted-in after that date.  Likewise, Plaintiffs make several statements concerning Mr. Ashley and Ms. DeCillis entering into "contracts," (plural) "loan agreements," (plural) and "loans" (plural) on Lend America's behalf, when the cited testimony supports only that these Defendants signed a single loan agreement.  (Pl. 56.1 Stmt. ¶¶ 30, 31, 47, 48; DeCillis Tr. 118-19.)  And Plaintiffs further claim that Ms. DeCillis "changed the compensation plan for Lend America's employees," when, in fact, the cited testimony indicates only that Ms. DeCillis participated in a "group decision" along with five other executives.  (Pl. 56.1 Stmt. ¶ 50; DeCillis Tr. 77-78.)

**Fourth**, Plaintiffs' purported "undisputed facts" sometimes resort to vague, conclusory language that ignores serious evidentiary ambiguities.  For instance, Plaintiffs contend that Mr. Ashley "controlled" the sales force.  (Pl. 56.1 Stmt. ¶ 18.)  But, although citing Ms. DeCillis' deposition, this statement ignores Ms. DeCillis' clear testimony that only

_____

[5] In addition, Pl. 56.1 Stmt. ¶ 1 refers to loan officers who received a guaranteed salary of $455 per week before "June 1, 2009."  But the cited Interrogatory responded to a question concerning the period before "June 1, 2008."  Lend America Interrogatory ¶ 12.

certain salespeople reported to Mr. Ashley, and that another employee had "day-to-day" supervisory responsibility over the loan officers. (DeCillis Tr. 42-43.)

**Finally**, even when Plaintiffs adequately support a factual contention, Defendants frequently point to evidence that places that fact in dispute. For instance, although Mr. Mayette testified that Mr. Ashley functioned as Lend America's CEO, Defendants identify deposition testimony that conflicts with Mr. Mayette's claim. (See DeCillis Tr. 26; Franco Tr. 94) (setting forth, respectively, that Mr. Primeau was CEO and "oversaw" the whole operation, while another executive, Joseph Forgione, was a "big honcho").

The end result is that Plaintiffs have set forth relatively few truly undisputed facts, especially for the period after June 2005.[6] The Court summarizes these facts below:

A. Lend America's Policies

Before June 1, 2008, Lend America did not pay minimum wages or a guaranteed minimum salary to some inside sales persons, and failed to keep accurate time records for its employees. (Pl. 56.1 Stmt. ¶¶ 1, 3, 4). On June 27, 2008, Lend

---

[6] In light of the serious problems with Plaintiff's Rule 56.1 Statement, Plaintiffs' counsel is reminded of his obligations and responsibilities under Fed. R. Civ. P. 11(b)(3) to verify that purported "factual contentions have evidentiary support or, if specifically so identified, will likely have evidentiary support after a reasonable opportunity for further investigation or discovery."

America changed its compensation policy to guarantee minimum salaries, minimum wages, and overtime premiums (Pl. 56.1 Stmt. ¶ 10.) This change resulted from a "group decision" made by Mr. Ashley, Ms. DeCillis and four other executives. (Pl. 56.1 Stmt. ¶¶ 33, 34, 50.) Contrary to Plaintiffs' claims, there is no undisputed evidence that Lend America failed to pay overtime to anyone at anytime.

   B.  <u>Mr. Ashley</u>

       While Mr. Mayette worked for Lend America, Mr. Ashley had the power to hire and fire loan officers. During these time periods, Mr. Ashley maintained an "open door policy" to assist loan officers, could set loan officer compensation, and could enforce Lend America's wage and hour policies. In addition, Mr. Ashley personally determined Mr. Mayette's bonus, and spent company funds on luxury cars, private jets, and his auto racing business. (Pl. 56.1 Stmt. ¶¶ 22, 26, 28, 32, 33, 39.)

       During the entire class period, Mr. Ashley hired and fired employees, but not necessarily loan officers. He did, however, conduct meetings with them, and could discipline or promote them. In addition, he could plan loan officers' work schedules, although he rarely exercised that authority, with other individuals having primary responsibility. Along with three other executives, Mr. Ashley played a role in determining loan officers' job duties. And, along with five other

executives, he participated in the decision to change loan officer compensation in June 2008. More generally, Mr. Ashley had some involvement in Lend America's marketing policies. And he signed a loan agreement on Lend America's behalf. (Pl. 56.1 Stmt. ¶¶ 20, 22, 24, 25, 27, 30, 31, 33, 34, 36, 41 47, 48, 50.)

C. Ms. DeCillis

Ms. DeCillis served as Lend America's Chief Operating Officer. (Pl. 56.1 Stmt. ¶ 42.) In this capacity, she hired, fired, and disciplined some employees, but not necessarily loan officers. (Pl. 56.1 Stmt. ¶¶ 44, 45.) She did sometimes communicate with loan officers, such as to provide them with updates on Lend America's products. (Pl. 56.1 Stmt. ¶ 51.) As of February 1, 2008, she was the person at Lend America most knowledgeable about the decision to classify loan officers as exempt from the FLSA. (Pl. 56.1 Stmt. ¶ 43.) And, in June 2008, she participated in the "group decision" to change loan officer compensation. (Pl. 56.1 Stmt. ¶ 50.) More generally, she had the authority to sign Lend America checks, but never exercised this authority. (Pl. 56.1 Stmt. ¶ 46.) But she once signed a loan agreement on Lend America's behalf. (Pl. 56.1 Stmt. ¶¶ 47, 48.)

D. Mr. Primeau

The facts concerning Mr. Primeau are largely uncontested. Mr. Primeau failed to oppose summary judgment,

and, with a few exceptions, neither Mr. Ashley nor Ms. DeCillis dispute Plaintiffs' version of the facts concerning Mr. Primeau. So, based on Plaintiffs' Rule 56.1 Statement, the Court can treat the following as admitted:

During the relevant time period, Mr. Primeau served as Lend America's President, Chief Executive Officer, and majority owner. (Pl. 56.1 Stmt. ¶¶ 53–55.) In this capacity, he oversaw Lend America's entire operation. (Id. ¶ 56.) To this end, he established Lend America's marketing policies. (Id. ¶ 57.) He hired and fired employees. (Id. ¶ 58.) He conducted meetings with loan officers. (Id. ¶ 59.) He had the authority to discipline and promote loan officers. (Id. ¶¶ 60, 61.) He supervised loan officers and other employees. (Id. ¶ 62.) He determined loan officers' work schedules, and participated in determining loan officers' job duties. (Id. ¶¶ 68, 69.) In June 2008, he participated in the "group decision" to change loan officers' compensation. (Id. ¶ 67.) He had the authority to enforce Lend America's wage and hour policies. (Id. ¶ 70.) And the Human Resources and Payroll departments reported directly to him. (Id. ¶ 71.) Additionally, he signed checked drawn on Lend America accounts, and entered into contracts on Lend America's behalf. (Id. ¶¶ 63, 64.)

E.   Mr. Ashley's Invocation of the Fifth Amendment

Mr. Ashley asserted his Fifth Amendment privilege against self-incrimination in response to every question Plaintiffs asked him.  (Pl. 56.1 Stmt. ¶¶ 73-74.)  At trial, Mr. Ashley's assertion of the privilege will permit the jury to draw an adverse inference against him.  But, on summary judgment, the Court cannot draw reasonable inferences against a non-moving party, even when those inferences stem from that party invoking the Fifth Amendment.  See Stichting Ter Behartiging Van de Belangen Van Oudaandeelhouders In Het Kapitaal Van Saybolt International B.V. v. Schreiber, 407 F.3d 34, 55 (2d Cir. 2005).  Consequently, for this motion's purposes, the Court ignores Mr. Ashley's resort to the Fifth Amendment.

DISCUSSION

I.   Standard of Review

"Summary judgment is appropriate where there are no genuine disputes concerning any material facts, and where the moving party is entitled to judgment as a matter of law."  Harvis Trien & Beck, P.C. v. Fed. Home Loan Mortgage Corp. (In re Blackwood Assocs., L.P.), 153 F.3d 61, 67 (2d Cir. 1998) (citing Fed. R. Civ. P. 56(c)).

"The burden of showing the absence of any genuine dispute as to a material fact rests on the party seeking summary judgment."  McLee v. Chrysler Corp., 109 F.3d 130, 134 (2d Cir.

1997).  "In assessing the record to determine whether there is a genuine issue to be tried as to any material fact, the court is required to resolve all ambiguities and draw all permissible factual inferences in favor of the party against whom summary judgment is sought."  <u>McLee</u>, 109 F.3d at 134.

"Although the moving party bears the initial burden of establishing that there are no genuine issues of material fact, once such a showing is made, the non-movant must 'set forth specific facts showing that there is a genuine issue for trial.'"  <u>Weinstock v. Columbia Univ.</u>, 224 F.3d 33, 41 (2d Cir. 2000) (internal quotations and citations omitted).  "Mere conclusory allegations or denials will not suffice."  <u>William v. Smith</u>, 781 F.2d 319, 323 (2d Cir. 1986).

II.  FLSA Exemption Defenses

Plaintiffs first seek summary judgment on Defendants' affirmative defenses that various FLSA exemptions may have covered certain opt-in Plaintiffs.  None of the Defendants contest Plaintiffs' legal argument, thereby abandoning these defenses.  <u>See</u> <u>Oparaji v. Atl. Container Line</u>, 07-CV-2124, 2008 U.S. Dist. LEXIS 66063, at *41 (S.D.N.Y. 2008).  Thus, to the extent that Plaintiffs' undisputed facts support their claims, Plaintiffs are entitled to summary judgment against these defenses.

These facts support Plaintiffs' claims only in part. Except for those loan officers who received more than $455 in guaranteed salary per week, Plaintiffs are entitled to summary judgment as to whether the administrative, executive, professional, highly-compensated, or combination exemptions apply. (Pl. Br. at 8-9.) But Plaintiffs are wrong that just 12 opt-in Plaintiffs might qualify under these exemptions, because their evidence only concerns loan officers who opted-into this case by March 19, 2009. It says nothing about more recent opt-in Plaintiffs.

Similarly, Plaintiffs are wrong that just 28 Plaintiffs might qualify under the outside sales exemption. Again, their evidence only concerns loan officers who opted-in by March 19, 2009, and says nothing about Plaintiffs who joined after that date.

Defendants do not dispute Plaintiffs' argument that the retail sales exemption does not cover any of the Plaintiffs. And the undisputed facts do not conflict with Plaintiffs' argument. Thus, Defendants have abandoned this defense. Oparaji, 2008 U.S. Dist. LEXIS 66063 at *41.

III. Individual Liability

The FLSA broadly defines "employer" to include "any person acting directly or indirectly in the interest of an employer in relation to an employee." 29 U.S.C. § 203(d).

14

"Because the statute defines employer in such broad terms, it offers little guidance on whether a given individual is or is not an employer." Herman v. RSR Sec. Servs., 172 F.3d 132, 139 (2d Cir. 1999). "In answering that question, the overarching concern is whether the alleged employer possessed the power to control the workers in question, with an eye to the 'economic reality' presented by the facts of each case." Id. (internal citations omitted). This "economic realities" test includes four non-exclusive factors: "whether the alleged employer (1) had the power to hire and fire the employees, (2) supervised and controlled employee work schedules or conditions of employment, (3) determined the rate and method of payment, and (4) maintained employment records." Id. (internal citations and quotations omitted). None of these factors "standing alone is dispositive. Instead, the 'economic reality' test encompasses the totality of circumstances, no one of which is exclusive." Id. (internal citations and quotations omitted). In considering these factors, courts should understand that the FLSA employer standard "does not require continuous monitoring of employees, looking over their shoulders at all times, or any sort of absolute control of one's employees." Id. Instead, "[c]ontrol may be restricted, or exercised only occasionally, without removing the employment relationship from the

protections of the FLSA." Id. In addition, "operational control" over the plaintiffs is relevant. Id.

The question of whether any Defendant is an FLSA "employer" is a "mixed question of law and fact," involving "the application of a legal standard to a particular set of facts." Zheng v. Liberty Apparel Co. Inc. ("Zheng II"), 617 F.3d 182, 185-86 (2d Cir. 2010) (internal citations and quotations omitted) (using different test to determine whether manufacturer served as "employer" for contractor's employees). Only "the ultimate decision as to whether a party is an employer," is a legal question. Zheng v. Liberty Apparel Co. Inc. ("Zheng I"), 355 F.3d 61, 76 (2d Cir. 2003). The "historical findings of fact that underlie each of the relevant factors" and the "findings as to the existence and degree of each factor" are factual questions. Zheng, 355 F.3d at 76. Mixed questions of fact and law, such as this, are "especially well-suited for jury determination." Zheng II, 617 F.3d 182, 185-86 (internal citations and quotations omitted). It follows then that "this determination is rarely suitable for summary judgment." Spicer v. Pier Sixty LLC, 2010 U.S. Dist. LEXIS 76782, at *31-34 (S.D.N.Y. July 26, 2010).

A. Mr. Primeau

Mr. Primeau has not contested Plaintiffs' summary judgment motion. But this does not mean that Plaintiffs win by

16

default. Instead, the Court must "examin[e] the moving party's submission to determine if it has met its burden of demonstrating that no material issue of fact remains for trial." Vt. Teddy Bear Co. v. 1-800 BEARGRAM Co., 373 F.3d 241, 244 (2d Cir. 2004). And "[i]f the evidence submitted in support of the summary judgment motion does not meet [Plaintiffs'] burden of production, then summary judgment must be denied," even though Mr. Primeau failed to oppose it. To that end, the Court considers whether Plaintiffs have sufficiently established that Mr. Primeau functioned as their FLSA "employer," under the "economic realities" test.

### 1. Power to Hire and Fire Loan Officers

The first prong focuses on whether Mr. Primeau had the power to "hire and fire the employees." Herman, 172 F.3d at 139. Because this prong goes to the ultimate question of whether the individual had "the power to control the workers in question," the Court understands "the employees" to mean the Plaintiffs, not any employees in general. Id. Thus, to answer this question, the Court looks at whether Mr. Primeau had the power to hire and fire loan officers specifically, not whether he could hire and fire other employees.

The record strongly suggests that Mr. Primeau had this power. He was Lend America's President, CEO, and majority owner. (Pl. 56.1 Stmt. ¶¶ 53-56.) And, not only did he oversee

17

Lend America's entire operation, he directly supervised Denise Tyler, who hired the loan officers. (Id. ¶ 56; DeCillis Tr. 51-52.) So, it's a reasonable inference to assume that, given Mr. Primeau's status and power, he could hire and fire loan officers if he wished. But, as the party moving for summary judgment, Plaintiffs cannot benefit from reasonable inferences. And, although Plaintiffs establish that Mr. Primeau could hire and fire some employees (Pl. 56.1 Stmt. ¶ 58), nothing in the record indicates that this power extended to lower-level employees, such as loan officers. And on summary judgment, the Court cannot connect these dots in Plaintiffs' favor. Consequently, the Court considers this factor undecided.

> 2.  Supervising and Controlling Work Schedules & Conditions of Employment

The undisputed evidence reflects that Mr. Primeau had the authority to "supervise," discipline and promote loan officers, including determining their schedule and job duties. (Id. ¶¶ 60, 61, 62, 68, 69.) However, aside from having the theoretical power to discipline and promote loan officers, the Court has no idea what Mr. Primeau's supervisory powers actually were. Rather, Plaintiffs' statement that Mr. Primeau supervised loan officers reflects only Ms. DeCillis' testimony that "you could say every employee of the company reported to him. He was the owner." (Id. ¶ 62, citing DeCillis Tr. 36.) Still, the

Court finds that Plaintiffs have submitted enough evidence to meet this prong, albeit barely.

### 3.  Determining the Rate & Method of Payment

The undisputed evidence reflects that Mr. Primeau played a role in the "group decision" to change loan officers' compensation in June 2008, apparently to ensure that Lend America fully complied with the FLSA going forward. (Id. ¶ 67.) But Plaintiffs identify no other undisputed evidence concerning Mr. Primeau's power to set loan officer compensation, such as his role (if any) in the original decision to pay some loan officers only on commission.  As President, CEO, and majority owner, it is certainly reasonable to assume that Mr. Primeau significantly influenced these decisions.  But, again, the Court cannot grant the moving party reasonable inferences on a summary judgment motion.  So the Court considers this factor undecided.

### 4.  Maintained Employment Records

The evidence reflects that Lend America's Human Resources and Payroll departments reported to Mr. Primeau. (Id. ¶ 71.)  In addition, Mr. Primeau signed Lend America's payroll checks. (Id. ¶¶ 63, 64.)  The Court finds that this evidence suffices to meet the fourth factor.

### 5.  Summary

On the surface, the question of Mr. Primeau's liability as an FLSA "employer" seems simple.  The four-factor

"economic reality" test seeks to address the "overarching concern" of whether a specific individual defendant "possessed the power to control the workers in question." Herman, 172 F.3d at 139. And it's certainly reasonable to assume that a company's President, CEO, and majority owner could "control" low-level sales employees if he wanted to.

But summary judgment requires undisputed evidence, not inferences or assumptions. And here, the following disputed issues weigh against granting Plaintiffs' summary judgment. First, as discussed above, Plaintiffs have failed to adduce sufficient evidence to permit the Court to find, as a matter of law, that Mr. Primeau had the authority to hire and fire loan officers, or determine their compensation – two of the four primary economic reality factors. Second, although Plaintiffs present enough evidence to find that Mr. Primeau meets the other two primary economic reality factors (supervising/controlling conditions of employment and maintaining employment records), significant factual disputes exist concerning the "degree" of Mr. Primeau's authority in those areas. Zheng, 355 F.3d at 76 ("degree of each factor" is a factual question best resolved by the jury). For instance, although Plaintiffs have successfully established that Mr. Primeau "supervised" loan officers (Pl. Stmt. ¶ 62), they have provided little undisputed information concerning what this supervision consisted of, beyond a general

authority to discipline and promote. And third, in their zeal to win summary judgment against three individual defendants, Plaintiffs have somewhat impeached their case against Mr. Primeau. Among other things, Plaintiffs contend that, although Mr. Primeau served as Lend America's CEO, he held this title in name only, with Mr. Ashley actually "function[ing] as the Chief Executive Officer." (Pl. 56.1 Stmt. ¶ 14.) Accordingly, the Court must, on this motion, presume that Mr. Primeau exercised substantially less authority and control than a typical CEO. It follows then that the Court must DENY Plaintiff's motion as against Mr. Primeau.[7]

B.  <u>Mr. Ashley</u>

The Court now considers the economic reality test as applied to Mr. Ashley.

1.  <u>Power to Hire and Fire Loan Officers</u>

The only evidence indicating that Mr. Ashley had the power to hire and fire loan officers stems from Mr. Mayette's testimony. Mr. Mayette's personal knowledge ended with his

---

[7] The Court notes that, in seeking summary judgment against the Individual Defendants, Plaintiffs rely heavily on the Second Circuit's decision in <u>Herman</u>, and the Sixth Circuit's decision in <u>U.S. Dep't of Labor v. Cole Enterprises, Inc.</u>, 62 F.3d 775 (6th Cir. 1995). But these cases are largely inapposite, because they applied a clear error standing in reviewing factual findings following a bench trial. They say nothing useful about whether to award summary judgment when, as is the case here, the Individual Defendants clearly exercised some control over the Plaintiffs, but each Defendant's degree of control is disputed or unsubstantiated.

employment in June 2005. Under Second Circuit law, his testimony that Mr. Ashley had this power at one point permits the factfinder to infer that Mr. Ashley continued to exercise this power. See Herman, 172 F.3d at 140. But, on summary judgment, the Court is not the factfinder and cannot draw inferences in Plaintiffs' favor. Consequently, for this motion's purposes, the Court considers Mr. Mayette's testimony relevant only for the two periods of his employment, and no more. That being said, Mr. Mayette's testimony is uncontested within that time period. Consequently, the Court finds that Mr. Ashley had the power to hire and fire loan officers while Mr. Mayette was employed.

### 2. Supervising and Controlling Work Schedules & Conditions of Employment

With respect to the second factor, the evidence reflects that Mr. Ashley conducted meetings with loan officers, and had the authority to both discipline and promote them. In addition, Mr. Ashley had the authority to plan loan officers' work schedules, though he rarely exercised this power. Also, Mr. Ashley played a role in determining loan officers' job duties and, during Mr. Mayette's tenure with Lend America, maintained an "open door policy" to assist loan officers in performing their duties.

The Court finds that, given these facts, the second prong decidedly tips against Mr. Ashley for the entire relevant time period.

### 3. Determining the Rate & Method of Payment

The evidence reflects that, during Mr. Mayette's time with the company, Mr. Ashley had the authority to set loan officer compensation, and enforce Lend America's wage and hour policies. The evidence further reflects that, in June 2008, Mr. Ashley participated in a group decision to change the loan officer compensation system. But it is totally unclear what degree of authority he exercised within this group. And it is also unclear what additional actions, if any, Mr. Ashley took to set loan officer compensation.

Given this evidence, the Court finds that Plaintiffs have established the third prong with respect to the periods of Mr. Mayette's employment, but not afterwards.

### 4. Maintained Employment Records

The evidence reflects that, during Timothy Mayette's tenure, Mr. Ashley directly supervised and controlled Lend America's Human Resources Department. So the Court finds that Plaintiffs have established that Mr. Ashley had at least some authority over maintaining employment records, at least for the period of Mr. Mayette's employment. Conversely, Plaintiffs have provided nothing with respect to the rest of the relevant time.

5. <u>Summary</u>

During the period of Mr. Mayette's employment, the evidence reflects that Mr. Ashley had substantial operational and day-to-day control over Lend America's loan officers, including the power to hire, fire, discipline, promote, assign work schedules, set compensation, enforce wage and hour policies, and, to some degree, maintain employment records.

Plaintiffs' evidence for the rest of the class period is much weaker, and largely addresses only the second prong, which focuses on supervising and controlling conditions of employment. And, even as to this factor, significant factual disputes exist concerning the "degree" of Mr. Ashley's control. <u>Zheng</u>, 355 F.3d at 76. For instance, Plaintiffs contend that both Mr. Primeau and Ms. DeCillis had significant authority and control in this area. (Pl. Stmt. ¶¶ 43-45, 50, 51, 53, 60-62, 68-70.) And Ms. DeCillis, in her Declaration, attests that Mr. Ashley "was primarily a big-picture idea man and as far as I remember . . . was not involved in the day-to-day minutiae of running the Sales Department." (DeCillis Decl. ¶ 8.)[8]

---

[8] It is well-settled that a party cannot create a genuine issue of material fact by submitting a self-serving declaration that contradicts prior deposition testimony. <u>See</u> <u>Clarke v. JPMorgan Chase Bank</u>, N.A., 08-CV-2400, 2010 WL 1379778, at *2 (S.D.N.Y. 2010). This principle is inapplicable here, for two reasons. First, Mr. Ashley does not rely on his own declaration, but rather Ms. DeCillis'. And second, as it relates to Mr. Ashley, Ms. DeCillis' Declaration is <u>not</u> self-serving. On the contrary,

24

Accordingly, as to Mr. Ashley, Plaintiffs' summary judgment motion is GRANTED IN PART. The Court awards Plaintiffs summary judgment only on the limited issue of whether Mr. Ashley functioned as an FLSA "employer" during the period of Mr. Mayette's employment. The Court does not award even a partial summary judgment on the issue of liability. Mr. Ashley's Answer identified twenty defenses. <u>See</u> Docket No. 156. And this opinion--at most--forecloses only a few of them, and, even then, only as to particular class members.

C. <u>Ms. DeCillis</u>

Plaintiffs' summary judgment case against Ms. DeCillis is extremely weak. With respect to the first prong, the evidence indicates that Ms. DeCillis hired, fired, and disciplined <u>some</u> employees. But there is no undisputed evidence that she ever hired, fired, or disciplined loan officers.

With respect to the second prong, there is no evidence that she ever set loan officers' work schedules or supervised their employment conditions. At most, the evidence reflects that Ms. DeCillis occasionally sent a few informational e-mails about Lend America products. (Pl. 56.1 Stmt. ¶ 51.)

Plaintiffs' evidence regarding whether Ms. DeCillis determined loan officer compensation (the third factor) is

---

if anything, Ms. DeCillis' personal interests lie in assigning as much blame on Mr. Ashley as possible.

stronger, but not by much, as it largely consists of the fact that Ms. DeCillis took part in one group decision concerning compensation. In this regard, the Court notes that--for this motion's purposes--the Court does not consider it particularly significant that, as of February 1, 2008, Ms. DeCillis was the most "knowledgeable" about the decision to classify loan officers as exempt from the FLSA. (Pl. 56.1 Stmt. ¶ 43.) "Knowledgeable" means just that. Ms. DeCillis' knowledge does not, _ipso_ _facto_, mean that she personally made the decision to classify loan officers as exempt. For instance, Coca-Cola's corporate historian probably knows the most about the Company's 19th Century advertising, but obviously played no role in approving those ads. And, while it may be reasonable to infer from Ms. DeCillis' knowledge that she played a significant role in the questioned compensation decision, the Court cannot grant that inference to Plaintiffs on summary judgment.[9]

Finally, Plaintiffs identify nothing that suggests Ms. DeCillis, the COO, maintained Lend America's employment records.

As to Ms. DeCillis, summary judgment is DENIED.

---

[9] In opposing Plaintiffs' motion, Ms. DeCillis informally requests that the Court award her summary judgment. (DeCillis Br. at 23-24.) Ms. DeCillis did not file a cross-motion and, in any event, the Court has found above, that disputed issues of fact exist concerning the scope of her authority. Thus, Ms. DeCillis' request is denied.

IV.  <u>Liquidated Damages</u>

Plaintiffs also seek summary judgment on the issue of whether they are entitled to liquidated damages.

Successful FLSA plaintiffs are ordinarily entitled to recover liquidated damages, in addition to unpaid minimum wages and/or overtime compensation.  29 U.S.C. § 216(b).  But the Court has the discretion to not award liquidated damages, if it finds that the defendant acted "in good faith" and "had reasonable grounds for believing that his act or omission was not a violation of the Fair Labor Standards Act."  29 U.S.C. § 260.  At trial, the defendant bears the "difficult" burden of "proving good faith and reasonableness."  <u>Herman v. RSR Sec. Services Ltd.</u>, 172 F.3d 132, 142 (2d Cir. 1999).

This case is not yet at trial.  Instead, the Court is deciding Plaintiffs' partial summary judgment motion.  So, notwithstanding Defendants' "difficult" trial burden, they have no burden to meet right now.  Instead, Plaintiffs must show that "there is an absence of evidence to support" a good faith and reasonableness affirmative defense.  <u>See</u> <u>F.D.I.C. v. Giammettei</u>, 34 F.3d 51, 54 (2d Cir. 1994); <u>Gayle v. Harry's Nurses Registry, Inc.</u>, 07-CV-4672, 2010 WL 5477727, at *6 (E.D.N.Y. Dec. 30, 2010) ("good faith and reasonableness" functions as an affirmative defense to liability for liquidated damages).

Plaintiffs fail to meet this burden. Plaintiff's Rule 56.1 Statement does not address whether any evidence exists to support a good faith and reasonableness defense. And, in briefing, Plaintiffs try to meet their burden largely by grossly misrepresenting Ms. DeCillis' deposition testimony. Specifically, Plaintiffs contend that, at deposition, Ms. DeCillis testified that "Defendants" "did not investigate or research whether their commission-only payment plan violated the FLSA," did not contact "the Department of Labor," and "made no effort to determine if a financial institution could qualify for the Retail or Service exemption." (Def. Br. at 21, citing DeCillis Tr. 96-97, 101-104.) Ms. DeCillis said no such things. Rather, in substance, Ms. DeCillis said only that she didn't "know what [loan officers] were classified as," didn't "recall" discussing their classification with any Lend America employee, didn't personally discuss their classification with the Department of Labor, didn't personally conduct any investigation into the subject, and didn't know if anyone else at Lend America had conducted such an investigation. (DeCillis Tr. 96-97, 101-104.) Ms. DeCillis added, however, that she spoke with "outside people" concerning the classification issue, and that Lend America's Director of Human Resources, Denise Tyler, could probably have more information about the subject. (Id.) So, rather than testify about what "Defendants," collectively, did

or didn't do, Ms. DeCillis largely stated only that she personally didn't know or couldn't recall certain information.

Taking Ms. DeCillis' testimony for what she actually said, the Court finds that Plaintiffs have not met their summary judgment burden. Ms. DeCillis' lack of personal knowledge or recollection does not establish, as a matter of law, that "Defendants" cannot adduce enough evidence to support a good faith and reasonableness defense. Nor does it even establish Ms. DeCillis' inability to establish such a defense, assuming that Plaintiffs can even prove her FLSA culpability. After all, significant factual disputes exist concerning the scope of Ms. DeCillis' authority over human resources matters. So, it may be that Ms. DeCillis, in good faith, reasonably assumed that corporate officials with more substantial human resources authority (such as Denise Tyler) would investigate and confirm the legality of Lend America's compensation practices.

V.   Willfulness

Plaintiffs also seek summary judgment on the issue of willfulness, and, in so doing, their right to a three-year limitations period. See 29 U.S.C. § 255(a) (willful violations subject to a three year statute of limitations). Because Plaintiffs cannot meet their summary judgment burden on the liquidated damages issue, they likewise cannot meet the higher burden involved with proving willfulness.

The Court separately addresses only one of Plaintiffs' willfulness arguments. Specifically, Plaintiffs contend that Defendants' conduct was willful because they "continued their unlawful policy [for] nine months after they learned their pay plan violated the FLSA through this lawsuit." (Def. Br. 24.) This argument ludicrously conflates the filing of a complaint with the winning of a judgment. Plaintiffs' Complaint is nothing more than allegations. From its filing, Defendants did not "learn," as a matter of law, that their pay practices "violated the FLSA." They "learned" only that the named Plaintiffs, and their counsel, had certain gripes. The Court **strongly warns** Plaintiffs' counsel not to craft such frivolous, illogical arguments in the future. See generally Fed. R. Civ. P. 11(b)(2) (attorneys should not present "legal contentions" unless "warranted by existing law or by a nonfrivolous argument for extending, modifying, or reversing existing law or for establishing new law").

## VI.   Attorneys' Fees and Costs

Plaintiffs' summary judgment motion also seeks "all attorneys' fees and costs incurred to date in the prosecution of this action." This request is denied. The FLSA permits recovery of attorneys' fees only upon entry of a "judgment." 29 U.S.C. § 216(b). And here, no judgment is appropriate.

<u>CONCLUSION</u>

Plaintiffs' motion for partial summary judgment is GRANTED IN PART AND DENIED IN PART.


SO ORDERED.


/s/ JOANNA SEYBERT_____
Joanna Seybert, U.S.D.J.

Dated:    January __28__, 2011
          Central Islip, New York